Joseph F. DALTON, Sr., Respondent
Below, Appellant,

v.

Linda J. CLANTON, Petitioner
Below, Appellee.

Supreme Court of Delaware.

Submitted: Dec. 20, 1988.
Decided: April 6, 1989.

Roderick R. McKelvie and Regina A. Iorii of Ashby, McKelvie & Geddes, Wilmington, for appellant.

Everett P. Priestley of Priestley & Joseph, Wilmington, for appellee.

Before CHRISTIE, C.J., and MOORE and HOLLAND, JJ.

HOLLAND, Justice:

This is an appeal from a decision by the Family Court. The issues presented in this appeal relate back to a decision of the Superior Court, which had reversed an earlier decision by the Family Court.[1] When the Superior Court reversed the initial decision of the Family Court, it held that Joseph F. Dalton ("Father") was obligated to provide support for two of his sons. One of these sons, Joseph, Jr., was an adult. The other son, Jason, was a minor.[2]

The statutory criteria which must be considered by the Family Court before entering a support order are set forth in 13

---

1. Until 1987, the Superior Court functioned as an intermediate court of appeals in some Family Court matters. 10 *Del.C.* § 960 (1975). This Court now has exclusive jurisdiction to hear civil appeals directly from the Family Court. *Wiland v. Wiland,* Del.Supr., 549 A.2d 306, 307

n. 6 (1988); *see also* 10 *Del.C.* § 960(a) (Supp. 1988).

2. The duty of the Father to contribute to the support of his minor son is set forth in 13 *Del.C.* § 501.

*Del.C.* § 514. However, in an effort to discharge its statutory obligations on a uniform basis, the Family Court has adopted a procedure in support cases, known as the "Melson Formula." In fact, the Family Court recognizes a rebuttable presumption that the Melson Formula should be applied in making all child support determinations.

In this case, the Family Court deviated from the Melson Formula in entering its original support order, concerning the minor son, Jason. As a result of that deviation, the Family Court's order was reversed. When the Superior Court remanded this case to the Family Court, it *directed* the Family Court to use the Melson Formula in determining the amount of support the Father was obligated to pay for Jason.

In this appeal, the Father acknowledges that 13 *Del.C.* § 501 imposes a duty upon him to contribute to the support of his minor son, Jason. The Father also acknowledges that the factors which the Family Court must consider before entering a support order for a minor child are set forth in 13 *Del.C.* § 514. However, the Father argues that the Melson Formula is inconsistent with 13 *Del.C.* § 514.

The Father argues, in particular, that in establishing the Melson Formula, the Family Court has adopted a mechanical calculation for setting an amount for child support that does not consider all of the statutory factors. The Father also argues that by recognizing a rebuttable *presumption* that the Melson Formula shall be applied to make child support determinations, the Family Court has shifted the focus in child support litigation away from the statutory factors and onto the court-created formula. The Mother argues to the contrary with respect to each of these challenges to the Melson Formula by the Father.

We find that the Family Court's adoption of the Melson Formula, as a rebuttable presumption, and as the proper method of determining all child support cases, is consistent with its statutory obligation to "[m]ake and publish Court rules governing policies, processes, practices, and proce-dures, which shall be uniform throughout the State." 10 *Del.C.* § 907(5). We also find that, as a rebuttable presumption, the Melson Formula is consistent with all of the factors set forth in 13 *Del.C.* § 514. However, in this case, we find that neither the Family Court's initial determination of the amount of support to be paid by the Father for Jason, nor the Superior Court's subsequent reversal of that order, addressed the operation of the Melson Formula as a rebuttable presumption. Therefore, we remand the petition for support, as to Jason, to the Family Court.

The Superior Court's decision that the Father had a duty to support his adult son was predicated upon its conclusion that Joseph, Jr. was unable to support himself. 13 *Del.C.* § 503. The Father argues that the facts in the record do not support the Superior Court's decision that his adult son, Joseph, Jr., is a "poor person unable to support himself." 13 *Del.C.* § 503. We agree. We find that the record supports the Family Court's determination that Joseph, Jr. is not a "poor person unable to support himself" and that the Father has no statutory obligation to support him.

### Basic Facts

The Father and Linda Clanton ("Mother"), were married in 1963. Three children were born from that marriage: Joseph, Jr., born February 5, 1964; Jeffrey, born July 14, 1968; and Jason, born July 13, 1970. The family resided in Pennsylvania. The Father and Mother separated in 1972 and were eventually divorced in 1974. The Father moved to Delaware, where he remarried. The Father also established a business in Delaware. The Mother remained in Pennsylvania. She married John Clanton in 1974 and two sons were born from that marriage.

### Procedural History

The Mother's support petitions in the Family Court of the State of Delaware alleged that both Jason and Joseph, Jr.

lived with her in Pennsylvania.[3] The Family Court referred the Mother's petitions for support to a Master. 10 *Del.C.* § 913(b). The Master was requested to make factual findings and recommendations. *Id.*

The Family Court Master found, as a fact, that Joseph, Jr. was able to support himself. The Master recommended that the Family Court find that the Father had no duty to support Joseph, Jr., since he was an adult. 13 *Del.C.* §§ 501, 503. The Master found, as a fact, that Jason was a minor entitled to be supported by his Father. 13 *Del.C.* § 501. The Master recommended that the Family Court order the Father to pay monthly support for Jason in the amount of $765.24. This latter recommendation by the Master was based exclusively upon a calculation according to the Melson Formula.

■ The Father petitioned to have a Judge of the Family Court review the Master's findings and recommendations *de novo*. 10 *Del.C.* § 913(c).[4] A Family Court Judge found, after a *de novo* review, that Joseph, Jr. was not a "poor person" within the meaning of 13 *Del.C.* § 503. Accordingly, the Family Court Judge held that the Father had no duty under Section 503 to support him. The Family Court Judge also reviewed *de novo* the Master's findings and recommendations, which were based upon the Melson Formula, quantifying the support obligation of the Father for Jason. The Family Court Judge stated that the Melson Formula served as a guide, not as a compulsion, in making support determinations.

The Family Court Judge noted that the statutory criteria were controlling. The Family Court Judge ruled that "13 *Del.C.* § 514 did not contemplate such bonanza" as would result in the Mother's favor, if the calculation resulting from an application of the Melson Formula was determined to be the Father's support obligation for Jason. The Family Court declined to enter a support order based upon a literal application of the Melson Formula. The Family Court ordered the Father to pay $450.00 per month for the support of Jason.[5]

The Mother filed an appeal in the Superior Court, pursuant to the then existing 10 *Del.C.* § 960(a) (1975). The decisions of the Family Court, holding that Joseph, Jr. was able to support himself and declining to apply the Melson Formula in establishing the support owed for Jason, were both reversed. The Superior Court remanded the matter to the Family Court. The Superior Court directed the Family Court to enter an appropriate support order, calculated according to the Melson Formula, for both Joseph, Jr. and Jason. The Family Court entered an order requiring the Father to pay $1,421.35 per month for the combined support of Joseph, Jr. and Jason.[6]

On March 28, 1988, the Father appealed to this Court from the final support order of the Family Court. On April 18, 1988, this Court granted the Father's motion to remand this matter to the Family Court for the purpose of supplementing the factual record and making further conclusions of law.[7] After receiving additional evidence, at a hearing following the remand from this Court, the Family Court found that Joseph, Jr. was capable of supporting himself, had become a productive capable adult, and was, therefore, not a "poor person" requiring the Father's support. No

---

**3.** The third son, Jeffrey, resided with the Father in Delaware.

**4.** Even in the absence of a petition for *de novo* review, the decisions of Masters must still receive some form of judicial scrutiny, before those recommendations are made an order of the Family Court by a judge. *See Redden v. McGill,* Del.Supr., 549 A.2d 695 (1988).

**5.** Before announcing the amount of support to be paid by the Father for Jason, the Family

Court afforded the parties an opportunity to reach an amicable settlement.

**6.** This combined figure for both sons was determined pursuant to the Melson Formula.

**7.** The motion by the Father had alleged that Joseph, Jr. was living apart from the Mother, had a full-time job and was self-sufficient.

evidence was presented to the Family Court which caused it to find a change with regard to Jason's status. The case was then returned to this Court pursuant to this Court's retention of jurisdiction. Supr.Ct. R. 19(c). Thereafter, the briefing of the issues raised in this appeal proceeded in accordance with the rules of this Court. Supr.Ct. R. 15.

### Duty to Support Adult Son

The first issue which we will address is whether, and if so, to what extent, the Father is obligated to support his adult son, Joseph, Jr. The Father argues that Joseph, Jr. has not been a "poor person," as that term is defined in 13 *Del.C.* § 503, since the outset of this litigation, and, therefore, that he has no legal obligation to provide support for Joseph, Jr. The Father argues that there is adequate evidence in the record to support the Family Court's initial and subsequent determinations that Joseph, Jr. was, and is, able to support himself. It is also argued by Father that if he does have a duty to support his adult son, Joseph, Jr., the Melson Formula is not applicable in calculating that obligation.

The Mother argues that the record supports a conclusion that Joseph, Jr. was, and is, a "poor person," who is entitled to be supported by both of his parents. The theory advanced by the Mother to impose a portion of the support obligation for Joseph, Jr. upon the Father, derives from 13 *Del.C.* § 503, which provides:

> Except as expressly provided in § 501 and § 502 of this title, the *duty to support a poor person unable to support himself* rests *upon* his spouse, *parents,* or children, in that order, subject to § 504 of this title as to expenses described therein. If the relation prior in order shall not be able, the next in order shall be liable, and *several relations of the same order shall, if able, contribute according to their means.* (emphasis added).

In this case, the Family Court initially found that Mother had failed to prove, by a preponderance of the evidence, that Joseph, Jr. was unable to support himself.

Here the evidence concerning the ungifted child, now age 21 is (1) the opinion of the mother with whom he lives that he is "unable to support himself" and (2) the testimony of a psychologist that in repeated testing he has not scored better than an IQ of 75, that he is only capable of routine, manual tasks, and can only work in a "sheltered workshop." Upon cross-examination the psychologist opined that the Social Security Administration, or Elwyn Training School might well train and place Joseph in paid work positions. Linda Clanton testified Joseph earned $200.00 last year from casual farm labor, and presently cares for [thirteen] head of horse. The father offers to provide a home and work position for Joseph which the mother declines (the [Family] Court assumes Joseph, an adult, has also declined the father's offer). The Court finds as fact that Joseph has not been shown by a preponderance of the evidence to be unable to support himself and thus, he is removed from the support Order. . . .

*Clanton v. Dalton,* Del. Fam., File No. E–9276, Parrish, J. (Jan. 7, 1986). The Superior Court reversed that decision, finding it to be an abuse of discretion. *Clanton v. Dalton,* Del.Super., C.A. Nos. 86A–FE–3 and 86A–FE–16 (consolidated), Bifferato, J. slip op. at 2, 1987 WL 8693 (Feb. 5, 1987). We find that the applicable standard of appellate review requires a contrary conclusion.

In an appeal from the Family Court, the standard and scope of appellate review is well established. *Wife (J.F.V.) v. Husband (O.W.V., Jr.),* Del.Supr., 402 A.2d 1202, 1204 (1979).[8] It "extends to a review of the facts and law, as well as to a review of the inferences and deductions made by the Trial Judge." *Id.* An appellate court has a "duty to review the sufficiency of the

8. *See also, Wife (D.S.) v. Husband (G.F.W.),* Del. Super., 521 A.2d 634 (1986).

evidence and to test the propriety of the findings." *Id.* However, appellate courts are also required to exercise judicial restraint, even though independently the appellate courts might have reached a different conclusion than the trial judge. *Id.* "Since the Trial Judge heard and observed the witnesses [an appellate court] will not disturb the Trial Judge's findings of fact, and make contradictory findings, unless they are clearly wrong and justice requires their overturn." *Id.* Moreover, in reviewing the inferences and deductions made by the trial court, an appellate court will draw its own inferences and deductions only if those of the trial court are not supported by the record and are not the product of an orderly and logical deductive process. *Id.*

 In this case, the Family Court found that Joseph, Jr. had been employed in the past and was then presently employed, albeit on a limited basis. The Family Court found that, in the opinion of the Mother's own expert witness, Joseph, Jr. could be trained and placed in a paid working position. These facts led the Family Court to infer that Joseph, Jr. was able to support himself.

We find that the initial factual findings which were made by the Family Court are supported by the record. We also find that the inference that Joseph, Jr. was able to support himself was the product of an orderly, logical deductive process. Therefore, as an appellate court, the Superior Court, in the exercise of judicial restraint, was obligated to accept the findings and inferences in the initial decision of the Family Court, even though, independently, it might have reached a different conclusion. *Id.*

When this Court remanded this matter to the Family Court, for the purpose of sup-

plementing the record regarding the status of Joseph, Jr., the Family Court found, as fact, that Joseph, Jr. had worked continuously since high school; had moved out of the Mother's home in October of 1987; had a Pennsylvania driver's license and drove to and from work each day; had a bank account; had owned a car and a truck; had been employed as a farm laborer for over a year; was earning approximately $196.00 per week; and that he had adequate money for his needs. The factual findings, which the Family Court made following this Court's remand, led it to do more than infer that Joseph, Jr. was capable of supporting himself. Those factual findings led the Family Court to conclude that Joseph, Jr. was, in fact, self-supporting. We find that conclusion and the evidentiary findings upon which it was based, are supported by the record.

Therefore, the decision of the Superior Court, reversing the Family Court's initial determination with respect to Joseph, Jr., is reversed. The initial and subsequent decisions of the Family Court, which found that Joseph, Jr. was and is not "a poor person unable to support himself," are affirmed. This case is remanded to the Family Court. The Family Court is directed to enter an appropriate order, denying the Mother's petition for support, with respect to Joseph, Jr.[9]

Since we have determined that the Father has no obligation to support Joseph, Jr., we need not address the issue of whether the Melson Formula was the proper mechanism to determine support for an adult child. Nevertheless, we must examine the Melson Formula, in the context of the order that was entered, pursuant to the Father's duty to support his minor son, Jason.

### Origin of the Melson Formula

The Family Court is vested with exclusive original jurisdiction to hear and deter-

---

9. The Family Court, the Superior Court, and this Court have examined the merits of the Father's obligation to support his non-resident adult son. However, we note that the Family Court has held that it "lacks subject matter jurisdiction over [a] non-resident 'poor' person." *Helen B.M. v. Samuel F.D.*, Del.Fam., 479 A.2d 852, 855

(1984). As a general rule, if a question was not fairly presented to the trial court for decision, it will not be considered for the first time on appeal. Supr.Ct. R. 8. Therefore, we do not decide an issue that was not raised in the Family Court, the Superior Court, or this Court.

mine all petitions for support. 13 *Del.C.* § 507. Section 514 of Title 13 provides that "[i]n determining the amount of support due to one to whom the duty of support has been found to be owing," the Family Court shall consider, among other things:

(1) The health, relative economic condition, financial circumstance, income, including the wages, and earning capacity of the parties, including the children;

(2) The manner of living to which the parties have been accustomed when they were living under the same roof;

(3) The general equities inherent in the situation.

13 *Del.C.* § 514.

The Melson Formula is named after its judicial craftsman, Judge Elwood F. Melson, Jr. of the Family Court of the State of Delaware. The formula was developed by Judge Melson in response to the directive of 13 *Del.C.* § 514. It was used by Judge Melson for the first time in the context of a child support case in 1977. *I.B. v. R.S. W.B.*, Del.Fam., File No. A–3000, Melson, J. (Nov. 10, 1977).

Almost immediately, several other judges in the Family Court began to apply Judge Melson's formula in child support cases. Each Family Court judge that used the formula found it to be an effective analytical model, by which to discharge the statutory directive of 13 *Del.C.* § 514. Approximately one year after its articulation by Judge Melson, his formula was being used by a majority of the Family Court judges.

The gradual, but steady, expansion of the use of Judge Melson's formula within the judiciary of the Family Court raised a practical concern. The Family Court is, and has been, required by statute, to "[m]ake and publish [Family] Court rules

governing policies, processes, practices, and procedures, which shall be uniform throughout the state." 10 *Del. C.* § 907(5). In order to provide a uniform method of determining support obligations, the judges of the Family Court unanimously adopted the Melson Formula, as a rebuttable presumption, to be used in support cases, effective January 26, 1979.[10]

The *basic principles* of the Melson Formula have been summarized as follows:

Parents are entitled to keep sufficient income to meet their most basic needs in order to encourage continued employment.

Until the basic needs of children are met, parents should not be permitted to retain any more income than that required to provide the bare necessities for their own self-support.

Where income is sufficient to cover the basic needs of parents and all dependents, children are entitled to share in any additional income so that they can benefit from the absent parent's higher standard of living.[11]

The *basic procedures* which are performed in an application of the Melson Formula are:

Step 1: *Determine Available Income of Each Parent.* The Melson Formula starts with net income. After determining net income for each parent, a self-support reserve ("primary support allowance") is subtracted from each parent's income. This reserve represents the minimum amount required for an adult to meet his or her own subsistence requirements.

Step 2: *Determine Childrens' Primary Support Needs.* The next step in applying the formula is to compute the primary support amount for each dependent. Like the self-support reserve,

**10.** Minutes of the Delaware Family Court Judges' Meeting, January 26, 1979.

**11.** *The Delaware Child Support Formula: Study and Evaluation, Report to the 132nd General Assembly,* Family Court of the State of Delaware, at 1–2 (April 15, 1984). *See also,* S. Paikin, *Child Support, reprinted in* 2 A. Rutkin, *Family Law and Practice* § 33.06[3][c], at 33–49 (1st ed.1985) [hereinafter Paikin, *Child Support* ].

the primary support amount represents the minimum amount required to maintain a child at a subsistence level.... Work-related child care expenses are added to primary support as are extraordinary medical expenses.

The child's primary support needs are pro-rated between the parents based upon available net income as determined in Step 1....

Step 3: *Determine Standard of Living Allowance (SOLA).* After primary support obligations of each parent are calculated in Step 2, including obligations for child care expenses and extraordinary medical expenses, a percentage of remaining income is also allocated to support of the child. The standard of living allowance enables the child to benefit from the higher living standard of a parent.... If a parent has dependents other than the child for whom support is being sought, and such other dependents are not covered by a court order, primary support amounts for such dependents are deducted from obligor income available for the Standard of Living Allowance.[12]

Following its unanimous adoption by the judges of the Family Court of the State of Delaware, the Melson Formula was not without its detractors. Like the Father in this case, many individuals who were ordered to pay support suggested that the Melson Formula generally provided a financial windfall to the custodial parent.[13] Conversely, it was often argued by custodial parents that the use of the Melson Formula resulted in support orders that were too low. *See* Hunter, *Child Support Law and Policy: The Systematic Imposition of Costs on Women,* 6 Harv. Women's L.J. 1, 7–11 (1983). Despite these divergent points of view, the underlying merits of the

Melson Formula have never been completely examined in a reported judicial decision.

### Melson Formula/Review in Delaware

The first, and ironically the only, reported decision which outlines the parameters of the Melson Formula appeared in 1979, and did so in an appendix. *Lucy K.H. v. Carl W.H.,* Del.Fam., 415 A.2d 510, 517–19 (1979). Thereafter, several reported opinions by the Family Court and the Superior Court have referred to the use of the Melson Formula in various contexts, which did not require an examination of its basic validity. *Husband J. v. Wife J.,* Del.Fam., 413 A.2d 1267 (1979); *DeFEO v. DeFEO,* Del.Fam., 428 A.2d 26 (1981); *Emsley v. Emsley,* Del.Fam., 467 A.2d 700 (1983); *Murphy v. Murphy,* Del.Fam., 467 A.2d 129 (1983); *Topper v. Topper,* Del.Super., 478 A.2d 640 (1984); *Wife (D.S.) v. Husband (G.F.W.),* Del.Super., 521 A.2d 634 (1986); *Kathleen L.H. v. Wayne E.H.,* Del. Fam., 523 A.2d 977 (1987); *Ardizzone v. Bailey,* Del.Fam., 542 A.2d 806 (1987). The only reported opinion of this Court, which makes reference to the Melson Formula, clearly stated that "our decision does not turn on the question of the Formula's validity and nothing we say bears on that subject." *R.T. v. R.T.,* Del.Supr., 494 A.2d 150, 152 n. 1 (1985).

Although there has been no reported judicial decision completely addressing the intrinsic merits of the Melson Formula, it has been the *subject* of constant review in the unreported decisions of the Delaware Family Court and of the Superior Court. Because the origin of the Melson Formula had been a judicial response to a statutory mandate, its analytical framework continued to be defined as the common law developed through its application in those decisions. By 1984, the Melson Formula had

12. R. Williams, *Development of Guidelines for Child Support Orders: Final Report to U.S. Office of Child Support Enforcement,* II–81 to –84 (National Center for State Courts, Williamsburg, Va., March 1987) [hereinafter Williams, *Guidelines*]. *See also,* Paikin, *Child Support, supra* note 11, at 33A–28 to –40.

13. *The Delaware Child Support Formula: Study and Evaluation, Report to the 132nd General Assembly,* Family Court of the State of Delaware, at 35 (April 15, 1984).

been refined by judicial opinions establishing net income by attribution;[14] determining the proper self-support deduction where the parent is remarried or cohabiting in a relationship as husband and wife;[15] defining extraordinary medical and allowable child care expenses; calculating child support where parents share joint or split custody;[16] modifying the support amount during periods of extended visitation; and enunciating circumstances under which an application of the formula may be inequitable.[17]

The Melson Formula has also been the *object* of extensive examination within the State of Delaware in several non-litigation contexts. In 1983, a joint resolution of the Delaware General Assembly created a "Blue Ribbon Task Force on Divorce Law Reform" to evaluate Delaware's domestic relations laws and to make recommendations for changes in those laws. The report of that Blue Ribbon Task Force was delivered to the General Assembly on March 15, 1984. That Task Force endorsed the principle of applying the Melson Formula in child support cases, as a rebuttable presumption. The report stated in part:

> While the Task Force has not studied the Melson Formula in detail, it supports in principle the establishment and use of a formula by the Family Court of a child support formula which is primarily based upon the actual net after-tax income of each parent or his or her earning capacity in order to assure uniformity of treatment of persons in comparable situations and to add some degree of predictability to the outcome of support cases which encourages out-of-court settlements and a consequent substantial saving in the legal fees and stress incident to litigation.
>
> . . . .
>
> ... [T]he Task Force endorses in principle the adoption and application of a uniform and equitable formula for the determination of child support which should be, as we understand the Melson Formula is, a rebuttable presumption which may be varied by the Family Court upon an appropriate showing.

*Report of the Blue–Ribbon Task Force on Divorce Law Reform to the 132nd General Assembly* at 9–11 (Mar. 15, 1984).

In 1983, the Delaware General Assembly passed another resolution. The second resolution requested that the Chief Judge of the Family Court review and evaluate the current Delaware support Melson formula and report his findings and recommendations back to the General Assembly.[18] The

---

**14.** A parent will be excused from making a financial contribution only if he or she is physically or mentally incapacitated or is caring for a very young child for whom the parents owe a joint legal responsibility. Thus, where a parent is caring for a young child of a relationship other than that between the parents in question, the obligation to secure employment will generally not be waived. *The Delaware Child Support Formula: Study and Evaluation, Report to the 132nd General Assembly,* Family Court of the State of Delaware, at 4–5 (April 15, 1984).

**15.** Delaware has a step-parent liability statute. 13 *Del.C.* § 505(4). This statute is a legal basis for the guideline provision which attributes the spouse's or cohabitant's income to the custodial parent. Under the statute, the support duty extends to "the child of a person with whom the obligor cohabits in the relationship of husband and wife." *Id. See also,* Paikin, *Child Support, supra,* note 11, at 33A–28.11 to –29.

**16.** S. Paikin & J. James, *Effective Case Management of Ancillary Divorce Matters under the*

*Delaware Family Court System,* Family Court of the State of Delaware, C–22 to –28 (August 1983).

**17.** *The Delaware Child Support Formula: Study and Evaluation, Report to the 132nd General Assembly,* Family Court of the State of Delaware, at 3 (April 15, 1984).

**18.** The Joint Resolution stated:

WHEREAS, the Delaware Support Formula (also known as the "Melson Formula") has for years been utilized in divorce actions to determine the amounts to be allocated for support payments; and

WHEREAS, the Delaware Support Formula has, from time to time, been attacked on various grounds, and has been criticized as being "unfair" and "unrealistic;" and

WHEREAS, although criticized, the use of a support formula appears to be increasing throughout the United States, and does provide for a much needed non-subjective evaluation of support needs.

Chief Judge of the Family Court submitted the report of his findings and recommendations to the Delaware General Assembly on April 15, 1984. The report emphasized the fact that the Melson Formula had not remained static from the time of its adoption by the Family Court, as a uniform standard, in 1979. The summation in that report stated that:

> [a]fter conducting substantial research, weighing the methods applied in other states, and considering the comments of the general public and the [B]ar, it is the conclusion of the Family Court judiciary that the [Melson Formula] continues to be a fair and equitable approach to setting child support as measured by both the letter and the spirit of Delaware law.

In 1985, the Long Range Courts Planning Committee of the Supreme Court of Delaware established its own Task Force "to comprehensively examine the structure and processes of the State-wide Family Court for the purpose of advising the General Assembly with respect to the operation of the Family Court ... and its responsibility to dispense justice in an efficient, consistent and compassionate manner." [19] On March 3, 1986, that Task Force submitted

WHEREAS, it is felt, nevertheless, that the time has come for a study and evaluation of the Delaware Support Formula.

NOW, THEREFORE:

BE IT RESOLVED by the House of Representatives of the 132nd General Assembly of the State of Delaware, the Senate concurring therein, that the Chief Judge of the Family Court is hereby requested to conduct a thorough review and evaluation of the Delaware Support Formula.

BE IT FURTHER RESOLVED that, in his study and evaluation, the Chief Judge shall, among other things, review the support formulas of other jurisdictions; and also the cost-of-living formula within the Delaware Support Formula.

BE IT FURTHER RESOLVED, that the Chief Judge is requested to make a progress report to the General Assembly of his initial findings on or before January 15, 1984. The Chief Judge is requested to make his Final Report, containing his findings and recommendations, or or before April 15, 1984.

,SYNOPSIS

This Resolution provides for a study and evaluation of the "Melson Formula".

its report to the Chief Justice, the Governor, and the Chairmen of the Judiciary Committees of the Senate and the House of Representatives of the State of Delaware. With respect to the support jurisdiction of the Family Court, the Long Range Courts Planning Committe Task Force found that, in most cases, the Melson Formula produced a fair result. The Task Force also found that the Melson Formula produced a consistent result from case to case:

> Thus, most of the time support determined in accordance with the formula is acceptable to both parties and, even if it is not, the parties know that their case was judged on the same basis as all other support cases." [20]

The Task Force concluded that "the continued use by the Family Court of the Melson Formula is not only proper but should be encouraged, with periodic reviews to adjust the Formula to reflect economic conditions and social mores.[21]

### Melson Formula/National Review

In 1975, a child support enforcement program was established as Part D of Title IV of the Social Security Act (known as the IV-D Program).[22] Child Support Enforce-

H.R.Con.Res. No. 116, 132nd Gen. Assembly (June 22, 1983).

**19.** *The Task Force on the Family Court of the Long Range Courts Planning Committee: A Report to the Governor of the State of Delaware, the Chief Justice of the State of Delaware, the Chairman of the Senate Judiciary Committee and the Chairman of the House Judiciary Committee,* at A–1 (March 3, 1986) [hereinafter *Task Force* ].

**20.** *Task Force, supra* note 19, at 64.

**21.** *Task Force, supra* note 19, at 64. (footnote omitted). The Task Force report also noted that since the Family Court uses the Melson Formula as a rebuttable presumption, "[a]n effort is required to reduce the number of occasions on which the Melson Formula is inappropriately applied," and produces an inequitable award. *Id.* at 65.

**22.** In 1935, the federal government became involved in child support issues with the passage of Title IV–A of the Social Security Act. 42 U.S.C. §§ 601–610 (1985). The federal government assumed responsibility for the support of

ment Act, Pub.L. No. 93–647, 88 Stat. 2361 (1975) (codified as amended at 42 U.S.C. §§ 651–662 (1985 & Supp.1988)). *See also* Paikin, *Child Support, supra* note 11 § 33.03[1], at 33–10. This Act created a federal/state partnership designed primarily to allow both the state and federal governments to recover in the costs of the program known as Aid to Families with Dependent Children (AFDC). 42 U.S.C. §§ 601–610 (1985). The child support enforcement program was amended in 1984. Child Support Enforcement Amendments of 1984, Pub.L. No. 98–378, 98 Stat. 1305 (1984).

A critical provision in the Child Support Enforcement Amendments of 1984 was the requirement that states establish guidelines for child support.[23] 42 U.S.C. § 667 (1988). The legislation provided that:

(a) Each State, as a condition for having its State plan approved under this part [42 U.S.C. §§ 651–662], must establish guidelines for child support award amounts within the State. The guidelines may be established by law or by judicial or administrative action.

(b) The guidelines established pursuant to subsection (a) shall be made available to all judges and other officials who have the power to determine child sup-

port awards within such State, but need not be binding upon such judges or other officials.

(c) The Secretary shall furnish technical assistance to the States for establishing the guidelines and each State shall furnish the Secretary with copies of its guidelines.

The Amendment made by subsection (a) shall become effective on October 1, 1987.

42 U.S.C. § 667 (Supp.1988). The federal regulations which implemented this Congressional mandate required that "[t]he guidelines must be based on specific descriptive and numeric criteria and result in computation of the support obligation." 45 C.F.R. 302.56 (1987).

In an effort to assist states in meeting the federal statutory requirement to establish support guidelines by October 1, 1987, the U.S. Department of Health and Human Services Office of Child Support Enforcement (OCSE) initiated the Child Support Guidelines Project ("Project").[24] The Principal Investigator of that project was Robert G. Williams, Ph.D. An Interim Report was issued by the Project in June 1985.[25] The Project's Final Report was published in March of 1987 and is entitled the *Development of Guidelines for Child Support*

---

destitute and needy children through the program which is now known as Aid to Families with Dependent Children (AFDC). *Id.*; *See also* Paikin, *Child Support, supra* note 11 § 33.03[1], at 33–9 to –10.

**23.** "The requirement attaches to any child support case in which the custodial parent has assigned to the state the right to receive support on behalf of a child receiving AFDC benefits as well as to any case in which the custodial parent seeks the services of the state child support enforcement agency in establishing a child support order." Paikin, *Child Support, supra* note 11 § 33.06[2], at 33–43 n. 3.

**24.** The Project was intended to accomplish the following objectives:

(1) Analyze the economic and legal factors that relate to development of guidelines;

(2) Identify alternative approaches to child support guidelines and perform a comparative analysis of their features;

(3) Develop one or more new approaches to child support guidelines;

(4) Assess the effects of alternative guidelines on levels of orders and on various subgroups (e.g. custodial parents with child care expenses);

(5) Provide technical assistance to states in their development of guidelines; and

(6) Analyze issues and develop new approaches relating to modification of child support orders.

Williams, *Guidelines, supra* note 12, at I–3.

**25.** R. Williams, *Development of Guidelines for Establishing and Updating Child Support Orders*, Report to U.S. Office of Child Support Enforcement (National Center for State Courts, Williamsburg, Va., June 1985). That same year there was a special issue of the Juvenile and Family Court Journal. *Special Issue: Child Support Enforcement*, 36 Juv. & Fam.Ct.J. (1985).

*Orders:* Final Report ("Final Report").[26]

After a national review, the Final Report concluded that there are three basic conceptual models for the development of child support formulas:

*Cost sharing.* In this approach, the needs of the child are specified first, based on a minimum standard of living, or based on a review of actual household expenses. The dollar amount so determined is apportioned between the parents, usually based on their respective incomes.

*Income sharing.* A proportion of parental income is allocated to the child. The specific proportion usually varies with the number of children and sometimes varies with the level or parental income. This type of guideline can be based on either gross or net parental income.

*Income equalization.* Under this model, the economic burden of the household dissolution, or non-formation, is distributed equivalently between the parents. To equalize standards of living between the separate households, income of each parent is allocated between the households based on the number of persons in each.[27]

The Final Report found that these three basic conceptual models had been implemented through the adoption of "support guidelines" in various states. After its examinations of the support guidelines that had been established throughout the United States, the Final Report specifically reviewed in detail five approaches to guidelines, that were receiving substantial attention throughout the country. They were the Income Shares Model,[28] the Cassetty model,[29] the Washington [State] Uniform Child Support Guidelines,[30] the Wisconsin Percentage of Income Standard,[31] and the Delaware Melson Formula. Williams, *Guidelines, supra* note 12 at, II–65 to –66.

The Child Support Guidelines Project meticulously scrutinized the Melson Formula. Therefore, at the same time that the Fami-

---

26. Williams, *Guidelines, supra* note 12 at, II–81 to –84.

27. Williams, *Guidelines, supra* note 12, at II–65.

28. The Income Shares Model has been developed by the Child Support Guidelines project staff. It is "based on the concept that the child should receive the same proportion of parental income he or she would have received if the parents lived together. Under this model, a basic child support obligation is computed based on the combined income of the parents (replicating total income in an intact household). This basic obligation is then pro-rated in proportion to each parent's income. Prorated shares of child care and extraordinary medical expenses are added to each parent's basic obligation." Williams, *Guidelines, supra* note 12, at II–vi.

29. "The Cassetty Model is a standard of living equalization approach developed by Dr. Judith Cassetty of the Texas Attorney General's office.... The first step in applying the Cassetty Model is to exempt from net income a poverty level of support for each member of the two households. Remaining income is then redistributed between the two households in proportion to the number of persons in each family unit. For joint custody cases, an adjustment is made to the model to account for time-sharing." Williams, *Guidelines, supra* note 12, at II–viii.

30. "The Washington guidelines are based on the *net* income of the parents and the number and ages of the children. Since many concepts of the Income Shares Model were derived from the Washington guideline[s], the Washington guidelines are functionally similar. The guideline allocates a percentage of both parents' net income to child support based on level of income, number of children, and age category of each child. This combined obligation is divided between the parents in proportion to their net incomes." Williams, *Guidelines, supra* note 12, at viii.

31. "The Wisconsin standard is the simplest of the five approaches. It is meant to replicate a tax to be used in the context of immediate, mandatory income withholding for all child support orders. The Wisconsin standard allocates child support based on the following percentages of obligor income: 17 percent for one child, 25 percent for two children, 29 percent for three, 31 percent for four, and 34 percent for five or more. It does not explicitly consider custodial parent income. There is no self-support reserve and no provision for adding child care and extraordinary medical expenses as incurred. Adjustments have recently been made to add to the Standard for shared physical custody and additional dependents." Williams, *Guidelines, supra* note 12, at II–vii.

ly Court was reviewing the Melson Formula, at the direction of the Delaware General Assembly, the Melson Formula was also the subject of a comparative national analysis at the direction of OCSE.[32] The recommendations to the states from the Advisory Panel of the Child Support Guidelines project are set forth in its 1987 Final Report. Three of those recommendations are noteworthy in this case:

> Recommendation # 9: The Advisory Panel recommends that guidelines be implemented by means of court rule of state-wide applicability, where feasible.[33]

> Recommendation # 4: The Advisory Panel recommends that each state adopt a child support guideline for use as a rebuttable presumption by the courts and the child support enforcement agencies.

> Recommendation # 5: The Advisory Panel recommends that states use either the Income model or the *Delaware Melson formula* as the basis for their child support guidelines.[34]

*Id.* at I–13 to –22 (emphasis added).

The Final Report characterized the Delaware Melson Formula as "an example of a hybrid cost sharing/income sharing approach." *Id.* at II–65. The Final Report found that the Melson Formula had evolved from its three basic principles into a "considerable degree of sophistication." *Id.* at II–81.[35] The Final Report concluded that the *Melson Formula is "the most comprehensive* of any approach in the number of factors directly addressed." *Id.* II–vii (emphasis added).[36]

### *Melson Formula Approved*

Even before the impetus of the federal child support project, this Court had con-

---

**32.** Chapter V of the Final Report and its appendices are particularly instructive. The Melson Formula and the other four models were applied to the same sets of variable support situations. Williams, *Guidelines, supra* note 12, at II–97 to –112.

**33.** Pursuant to the federal regulations, state guidelines can be implemented "by law or by judicial or administrative action." 45 C.F.R. 302.56 (1987).

**34.** There were six factors which led the Advisory Panel to recommend that states base their support guidelines on the Income Shares Model or Melson Formula. "First, both approaches ultimately base child support obligations on the parents' ability to pay, which ensures that the child shares in both the parents' standard of living.... Second, ... the Income Shares model and Melson formula count income of both parents in determining the amount of child support awards.... Third, both the Income Shares Model and the Melson formula allow for the subsistence needs of each parent.... Fourth, both the Income Shares Model and the Melson formula encourage continued involvement of both parents in the child's upbringing by means of adjustments for joint or extensively shared physical custody.... Fifth, neither the Income Shares model nor the Melson formula create substantial negative effects on major life decisions of the parents, such as re-marriage or labor force participation.... Sixth, the Income Shares and Melson [formula] models provide for separate treatment of work-related child care and extraordinary medical expenses. Williams, *Guidelines, supra* note 12, at I–15 to –17.

**35.** A paper prepared by the National Women's Law Center also concluded: "[W]e are encouraged by the sensitivity of several of the guidelines developed to date, particularly the Income Shares, and *Melson* formulas, to the range of factors affecting both parents and children which must be considered in a fair and workable guideline." N. Campbell & A. Kolker, *Child Support Guidelines: Striking the Balance Between Parents, Children and Stepfamilies* (Sept. 1986), *reprinted in Essentials of Child Support Guidelines Development: Economic Issues and Policy Considerations* at 163–186 (Proceedings of the Women's Legal Defense Fund's National Conference on the Development of Child Support Guidelines, Queenstown, Md., Sept. 1986) (emphasis added).

**36.** The National Center for State Courts (NCSC), under a grant from the Office of Child Support Enforcement, has assembled a compendium of the child support guidelines that have been adopted in each state. J. Munsterman & T. Henderson, *Child Support Guidelines Summary*, (National Center for State Courts, Arlington, Va., May 27, 1988) [hereinafter *Compendium*]. According to that compendium, the Melson Formula is used in Delaware, Hawaii, and West Virginia. *Id.* at 10. The Melson Formula has also been recommended for adoption in Florida. *Bernstein v. Bernstein,* 498 So.2d 1270, 1275 (Fla.Dist.Ct.App.1986).

cluded that mandatory guidelines and standards were essential for decisions in child support cases. *Gregory J.M. v. Carolyn A.M.*, Del.Supr., 442 A.2d 1373, 1377 (1982). We noted that, in the public interest, the judges of the Family Court should apply the same basic approach in exercising their statutory powers and obligations. *Id.* Therefore, we directed the Family Court to adopt a *"[r]ule* prescribing mandatory guidelines and standards, which will insure that findings, conclusions, and supporting reasons therefor, in all future ... child support cases, will be uniformly, clearly, and fully set forth by the Trial Judges." *Id.*

At the present time, the procedure used by the Delaware Family Court in support cases is still referred to as the Melson Formula. However, in response to this Court's directive, its common law precepts and refinements are now set forth, with precision, in a Family Court rule and in two official forms.

The basic principles of the Melson Formula are now found in Delaware Family Court Civil Rule 52(c):[37]

**(c) Child Support Cases.** The Court, in order to provide a uniform, equitable approach in applying Delaware law to all child support cases, shall consider the following:

(1) Each support obligor's monthly net income.

(2) The absolute minimum amount of income each support obligor must retain to function at maximum productivity.

(3) The number of support obligor's dependents in an effort to apportion the amount available for support as equally as possible between or among said dependents according to their respective needs.

(4) The primary child support needs and the primary support obligation of each obligor.

(5) The available net income for a Standard of Living Adjustment (SOLA) to be paid by each support obligor after meeting their own primary needs and those of dependents.

(6) A consideration of the factors set forth in 13 *Del. C.* Section 514.

Fam.Ct.Civ.R. 52(c). An intergral part of the Family Court Rule which recognizes the Melson Formula are two comprehensive official forms that are used in its application.[38] Form 509(p) (Appendix I) (Delaware child support procedure and recognition of the presumptive applicability of procedure) and Form 509 (Appendix II) (child support calculation)[39].

■ We have reviewed the statutory criteria which the Family Court must consider in deciding support cases. 13 *Del. C.* § 514. We have also considered the Family Court's statutory directive to the Family Court to provide for uniform policies in the exercise of jurisdiction. 10 *Del.C.* § 907(5). We have concluded that the procedure used by the Family Court of the State of Delaware, in deciding child support cases,

---

**37.** See former Family Court Rule 271(c).

**38.** A third form, Form 465, has resulted from the requirements of Family Court Civil Rule 16. It is used in support cases. However, it does not contain any of the Melson Formula's substantive components.

**39.** Substantial changes were made effective June 1, 1984 and remain in full force and effect. The changes to form 509 included:
—an increase in the primary support allowances of the first four members of the households of both parents (Part I);
—a decrease in the present primary support allowances commencing with the fifth person in the households of both parents (Part I);
—a reduction in the percentage of discretionary income awarded as SOLA commencing with the third child (Part II); and

—the placement of a presumptive ceiling on the percentage of income to be awarded as SOLA (Part II).
Additionally, certain policy considerations were clarified, as follows:
—the accountability of the custodial parent for child support payments received (Part III); and
—the presumption that the formula assumes that the absent parent has normal visitation arrangements with the child (Part IV).
*The Delaware Child Support Formula: Study and Evaluation, Report to the 132nd General Assembly,* Family Court of the State of Delaware, at 28 (April 15, 1984).

known as the Melson Formula, and reflected in the provisions of Family Court Civil Rule 52(c) and its official Forms 509p and 509 [40], is consistent with the letter and the spirit of 13 *Del.C.* §§ 504, 514 and 10 *Del.C.* § 907(5).[41]

We attach particular significance to the fact that the Melson Formula is recognized and operates as a rebuttable presumption in all child support cases.[42] As a rebuttable presumption, the Delaware procedure provides for a uniform approach to child support decisions, unless the Family Court is persuaded that an application of the Melson Formula would be inequitable. *Gregory J.M. v. Carolyn A.M.*, Del.Supr., 442 A.2d 1373, 1377 (1982). Therefore, "all persons are ensured of equal treatment, without restricting the authority of the [Family] Court to establish an order outside of the scope of the formula when the unique facts of a particular case so warrant." [43]

■ In the event that the Family Court does not enter an order in accordance with the calculations otherwise provided for pursuant to the Melson Formula, traditional notions of jurisprudence require that it to do two things. First, it must give the reasons for its conclusion that the presumptive applicability of the Melson Formula has been rebutted. *Gregory J.M. v. Carolyn A.M.*, Del.Supr., 442 A.2d 1373, 1376–77 (1982); *Husband M. v. Wife D.*, Del.Supr., 399 A.2d 847, 848 (1979). Second, it must give reasons for the decision that it does enter and which is in variance with the result that would otherwise follow from an application of the Melson Formula. *Husband M. v. Wife D.*, 399 A.2d at 848. These two requirements are indispensable to a meaningful appellate review.[44] *Gregory J.M. v. Carolyn A.M.*, 442 A.2d at 1376–77. Moreover, to the extent that cases are decided that vary from the Melson Formula and are affirmed on appeal or unchallenged, they will provide the basis for assuring uniformity to the parties in similar situations.

### Melson Formula/This Case

We have recognized the validity of the procedure in child support cases which is used by the Delaware Family Court. Unfortunately, it was not followed precisely in

40. These official forms must be reviewed and revised periodically. They should accurately reflect common law refinements of general applicability. They must also reflect current economic realities, in particular, with respect to those minimum needs which are quantified in the forms. *See e.g.,* T. Espenshade, *Investing in Children* (Urban Institute Press, Washington, D.C., 1984). The Conference Report to the 100th Congress 2d Session concerning the Family Support Act of 1988 recommended that, for federal purposes, states should review their guidelines at least once every four years. H.R. Conf.Rep. No. 100–998, 100th Cong. 2d Sess. 5 (1988).

41. We also note that, at the present time, the procedure for deciding child support cases, in the Family Court of the State of Delaware, incorporates all three of the recommendations of the Final Report that were previously identified. First, Delaware, as was to be expected, continues to follow the guidelines of the Melson Formula. Second, those guidelines have been implemented by means of a Family Court Rule: Fam.Ct.Civ.R. 52(c). Third, those guidelines operate as a rebuttable presumption. Form 509(p) (Appendix I).

42. Twenty other states recognize the presumptive applicability of their own child support guidelines. *Compendium, supra* note 36, at 4.

43. *The Delaware Child Support Formula: Study and Evaluation, Report to the 132nd General Assembly,* Family Court of the State of Delaware, at 2 (April 15, 1984). The Delaware Family Court has estimated that in approximately ten percent of its support cases, a strict application of the Melson Formula would have an inequitable result. *Id.* at 12.

44. The Conference Report to the 100th Congress 2d Session concerning the Family Support Act of 1988 recommends that "[t]here shall be a rebuttable presumption, in any judicial or administrative proceeding for the award of child support, that the amount of the award which would result from the application of such guidelines is the correct amount of child support to be awarded. A written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case, as determined under criteria established by the State, shall be sufficient to rebut the presumption in that case." H.R.Conf. Rep. No. 100–998, 100th Cong. 2d Sess. 5 (1988).

this case. That procedure is still known as the Melson Formula, but the entire procedure requires more than the mechanical application of an alegebraic equation. Both the Family Court and the Superior Court omitted an indispensable component of the Delaware child support procedure from their decisional process, i.e., the rebuttable presumption.

▇ In this case, the Family Court referred to the Melson Formula as a guide rather than a presumption. As a result of that inaccurate premise, the Family Court did not comment upon how the presumptive applicability of the Melson Formula had been rebutted. That omission was compounded when the Family Court's ultimate decision was rendered in conclusory terms, i.e., a support order based on the Melson Formula would result in a "bonanza" for the custodial parent. This Court has held that the Family Court must state the reasons for its decisions "for the benefit of the parties and of this Court." *Gregory J.M. v. Carolyn A.M.*, 442 A.2d at 1376; *see also Husband M. v. Wife D.*, 399 A.2d at 848.

▇ The Superior Court properly reversed the Family Court's decision which was incomplete and not in accordance with its own child support procedures. *Husband M. v. Wife D.*, 399 A.2d at 848. However, in its order of remand, the Superior Court did not give the Family Court an opportunity for concluding that the presumptive applicability of the Melson Formula had been rebutted. *Id.* Instead, the Superior Court *directed* the Family Court to enter an order in accordance with the Melson Formula.

▇ The mathematical result which is the product of the Melson Formula can never be the basis of a child support order under the Delaware procedure, until that result passes the litmus test of the rebuttable presumption. When the calculation according to the Melson Formula is mixed together with the specific facts in a case, the result must be equitable. If the result

is inequitable, the presumption is rebutted, and the support calculation pursuant to the Melson Formula must yield to the extent that is necessary to balance the equities in the case.

In this case, the facts may, or may not, support a conclusion that the Father has sustained his burden of overcoming the presumptive applicability of the Melson Formula. The Family Court must make that determination, in the first instance. Only after the Family Court specifically recognizes the presumptive applicability of the Melson Formula and, thereafter, gives the reasons for its ultimate decision, can there be meaningful appellate review in this case.

### Conclusion

The decision of the Superior Court with respect to Joseph, Jr. is REVERSED. The initial and subsequent decisions of the Family Court, concluding that Joseph, Jr. is *not* a poor person unable to support himself, are AFFIRMED. The decisions of the Superior Court and the Family Court, with respect to Jason are REVERSED. This case is REMANDED to the Family Court for further proceedings that are consistent with this opinion, on a priority basis. Jurisdiction in *not* retained.

### APPENDIX I

### THE FAMILY COURT OF THE STATE OF DELAWARE

### PROCEDURE IN DECIDING CHILD SUPPORT CASES

Delaware law provides that in determining a parent's child support obligation the Court shall consider, among other things:

"1. The health, relative economic condition, financial circumstance, income, including wages, and earning capacity of the parties, including the children;

2. The manner of living to which the parties have been accustomed when they were living under the same roof;

3. The general equities inherent in the situation." 13 *Del.C.* § 514.

IN ORDER TO PROVIDE A UNIFORM EQUITABLE APPROACH IN APPLYING DELAWARE LAW TO ALL CHILD SUPPORT CASES, THE FAMILY COURT OF DELAWARE HAS ADOPTED, AS A REBUTTABLE PRESUMPTION, THE FOLLOWING PROCEDURE.

PART I. PRIMARY CHILD SUPPORT
STEP A

1. DETERMINE EACH SUPPORT OBLIGOR'S NET INCOME.

*Add:*

a. Income from employment, as well as all other sources (such as pensions, dividends, interest, etc.); and

b. Business expense accounts to the extent that they provide the support obligor with something he would otherwise have to provide (such as automobile, lunches, etc.).

*Subtract:*

a. Income taxes figured on the basis of the maximum allowable exemptions;

b. Other deductions required by law, including attachments and child support payments made pursuant to Court order or written separation agreement;

c. Deductions required by the employer, or the union, except credit union payments;

d. Legitimate business expenses;

e. Benefits such as hospitalization insurance which are maintained for the obligor's dependents.

Deductions for payments on credit union debts will not be recognized except to the extent that such debts were incurred for indispensable items in use by the dependents or necessary health care. Support obligors will not be allowed to reduce the child support obligation by incurring debts other than for necessities of life.

Where a support obligor has inadequate income to meet his support obligation but owns assets, he will be required to convert all or some portion of said assets to cash for payment of support. *See,* e.g., *Rayias v. Rayias,* Del.Fam., Civil No. C–6146, James, J. (July 11, 1979).

Where a support obligor is not working full time or is working below full earning capacity, the Court will examine the reasons for such a limitation on earnings. If the reason is a matter of choice by the obligor or is due to factors other than care required by the children to whom the parties have a joint legal responsibility for support, the Court may then consider evidence establishing the obligor's earning capacity in the local job market. *See,* e.g., *Mayew v. Mayew,* Del.Fam., Civil No. 5–7313, Wakefield, J. (April 23, 1979); *Dempsey v. Blevins,* Del.Fam., Civil No. 2–6717, Arsht, J. (August 10, 1979); *Halsey v. Halsey,* Del.Fam., Civil No. B–2342, James, J. (January 10, 1980). Alternatively, the Court may consider the value of the services of the stay-at-home support obligor as a homemaker and set a dollar value which shall be considered as that obligor's "income."

Once the reason for the support obligor's limited earnings has been determined, the Court may consider evidence relating to the total monthly net income of the support obligor and "spouse" where the support obligor is remarried or cohabitating with another person in the relation of husband and wife, attributing to the support obligor up to 50% of the household income. *See,* e.g., *O'Malley v. Shavico,* Del.Fam., Civil No. 3–7582, Poppiti, J. (May 29, 1979); *McCarthy v. Butler,* Del.Fam., Civil No. 5–5277, Arsht, J. (June 20, 1979); *Swedenhjelm v. McNair,* Del.Fam., Civil No. C–5643, Poppiti, J. (August 28, 1979). Earning capacity or income so established will then be used by the Court to determine the obligor's monthly net income for the purpose of calculating child support.

ALL INFORMATION PRESENTED TO THE COURT IN THESE CALCULATIONS SHOULD BE BASED ON MONTHLY AMOUNTS. WHERE A PARTY IS PAID WEEKLY, THE PAY

SHOULD BE MULTIPLIED BY 52 AND DIVIDED BY 12 TO ARRIVE AT A CORRECT MONTHLY AMOUNT. LIKEWISE, IN ORDER TO BE CONSIDERED, ALL CHILD CARE EXPENSES, EXTRAORDINARY MEDICAL EXPENSES, MEDICAL INSURANCE PAYMENTS, ETC., MUST BE PRESENTED TO THE COURT IN ACCURATE MONTHLY AMOUNTS.

2. DETERMINE THE ABSOLUTE MINIMUM AMOUNT OF INCOME THAT EACH SUPPORT OBLIGOR MUST RETAIN TO FUNCTION AT MAXIMUM PRODUCTIVITY.

In determining what a support obligor needs (not what he spends), the Court will consider only expenses for food, clothing, shelter, medical care, and job-required transportation.

Four hundred fifty dollars ($450) a month is established as a base figure for an income producing adult head-of-household. Where a support obligor is remarried or cohabiting with another person in the relation of husband and wife *and* both the support obligor and his/her present "spouse" are fully employed, the minimum self-support need of the couple is $730 ($450 as first person + $180 as second person in the same household + $100 additional work-related expense of a second employed "spouse"). The support obligor will be allowed 50% of this amount, $365, as the minimum self-support deduction. *See,* e.g., *McCarthy v. Butler, supra; Guthrie v. Guthrie,* Del. Fam., Civil No. C–4403, Poppiti, J. (August 2, 1979); *Dempsey v. Blevins, supra.*

Where the Court has attributed 50% of the household income to a non-working support obligor who is remarried or cohabitating with another person in the relation of husband and wife, the minimum self-support deduction for such an obligor is established at $315, this amount being equal to 50% of the minimum support needs of the obligor and "spouse" ($450 + $180). No additional work-related expenses will be allowed since the obligor is not employed outside the home. *See,* e.g., *O'Malley v. Shavico, supra.* Any variance from these amounts must be supported by convincing evidence. *See,* e.g., *Moore v. Moore,* Del.Fam., Civil No. A–9447, Horgan, J. (November 26, 1979).

STEP B PRIMARY CHILD SUPPORT NEED

The minimum needs of the several members of a household are established below. The order of household members is ranked on the basis of age.

| | |
|---|---|
| First member (usually a parent) | $450 a month |
| Second member, 40% thereof, or | $180 a month |
| Third & Fourth members, 30% thereof, or | $135 a month |
| Each additional member, 20% thereof, or | $ 90 a month |

The primary child support need of each child in question will be considered by first determining that child's rank in the custodial parent's household and then using the appropriate figure shown above. Add to the total primary needs of all the children in question the cost of extraordinary medical expenses and the cost of child care needed to allow a custodial parent to work. Other expenses incurred because of the special needs of a child may be allowed if found by the Court to be necessary. *See,* e.g., *Swedenhjelm v. McNair, supra.* Subtract from the minimum needs of any child such child's earnings or income.

STEP C DETERMINE THE PRIMARY SUPPORT OBLIGATION OF EACH OBLIGOR

Divide each support obligor's available net income for child support by the total available net income for child support. The resulting percentage (%) establishes the burden each obligor should carry with respect to their children's primary support. This percentage should then be

multiplied by the total primary child support need in order to arrive at the primary support obligation of each obligor.

## PART II. STANDARD OF LIVING ADJUSTMENT (SOLA) CHILD SUPPORT

### STEP A DETERMINE THE AVAILABLE NET INCOME FOR SOLA SUPPORT

SOLA is designed to apportion, as equitable considerations require, the income available to a support obligor after he has met his own primary needs and those of his dependents. *See*, e.g., *I.B. v. R.S.W.B.*, Del.Fam., Civil No. A–3000, Melson, J. (November 10, 1977); *Flaherty v. Fidance*, Del.Fam., Civil No. B–2900, James, J. (January 8, 1980). Therefore, from the AVAILABLE NET FOR PRIMARY SUPPORT established in PART 1, STEP A, of the Child Support Calculation,

*Subtract:*

a. The primary support obligation calculated in PART 1, STEP C;

b. Other primary support obligations owed to children of the support obligor not of the union between the parents in this case;

c. Where the support obligor is remarried, or has other dependents as specified in 13 *Del.C.* § 505 *, the support obligor may be entitled to a deduction for such a dependent before calculating the SOLA obligation.

### STEP B CALCULATE SOLA SUPPORT OBLIGATION

Where income is available, both support obligors shall be required to pay 15% for the first child, 10% each for the second and third child, 5% each for the fourth, fifth, and sixth child, of the AVAIL-ABLE NET FOR SOLA SUPPORT established in PART II, STEP A, of the Child Support Calculation. *See*, e.g., *Flaherty v. Fidance, supra.* Total SOLA ordered shall not exceed 50% of the discretionary income unless there is a prior finding of a specific need.

### STEP C CALCULATE THE PER–CHILD SHARE OF SOLA SUPPORT

## PART III. TOTAL MONTHLY SUPPORT OBLIGATIONS

Where a support obligor is also a custodial parent, the obligor retains that share of the support obligation owed to the child in his custody and pays the difference, if any, to the other custodial parent for the benefit of other children.

This formula contemplates normal visitation arrangements. Where a parent establishes visitation or has physical joint custody significantly beyond the norm, then some adjustment in the amount derived from a formula calculation may result. This adjustment is allowable regardless of how the custodial arrangements are titled.

Where parties share physical joint custody on an equal basis, each will be considered to have the child for six months during the course of a year. To avoid unnecessary transfers of funds, the "pay out" of each parent for the year should be determined by multiplying the monthly support obligation times six months. If one parent's yearly obligation is greater than that owed by the other, the excess amount shall be divided by 12 and paid monthly over the course of the year, unless the parties agree otherwise. *See*, e.g., *Long v. Long*, Del.Fam., Civil No. A–4228, Poppiti, J. (October 23, 1981).

## PART IV. OPTIONAL SUPPLEMENTAL QUARTERLY CHILD SUPPORT

The Court may order a parent to pay supplemental quarterly child support di-

---

* 13 *Del.C.* § 505 states:
"(a) The duties of support specified in § 501 and § 504 of this title shall be performed according to the following order or priority:
(1) Duty to support one's own minor child;
(2) Duty to support a spouse;
(3) Duty to support a woman pregnant with child conceived out of wedlock;
(4) Duty to support a step-child or the child of a person with whom the obligor cohabits in the relationship of husband and wife;
(5) Duty to support a poor person."

rectly to the child and custodial parent jointly. These payments are designed to relieve the custodial parent of periodic child-related expenses and to make the child aware of the support received for his benefit from the other parent. *See,* e.g., *Alexander v. Alexander,* Del.Fam., Civil No. 16860, Buckson, J. (April 6, 1978). Where there is a substantial discrepancy in the respective incomes of the custodial and non-custodial parent after primary and SOLA child support have been determined, the Court may consider a supplemental award to enable the children to live at the higher standard of living enjoyed by the more affluent parent. *See,* e.g., *Flaherty v. Fidance, supra.* Any payments so ordered will be due on September 1, December 1, March 1, and June 1, unless a variance is warranted by convincing evidence.

## EXAMPLES OF HOW THE SYSTEM WORKS

(A) Father and Mother are divorced. Father lives alone; Mother and the parties' two children live together. Father nets $1,200/month; Mother nets $800/month. Both Mother and Father are income-producing obligors; therefore, each parent's minimum self-support need is $450/month. After deducting their own minimum need, Father has $750/month available net income for primary support; Mother has $350/month available for the same purpose.

The primary support need of the two children is $315/month ($180 plus $135). Mother's child care expense encumbered to enable her to work is $100/month. Thus, total primary support need equals $415/month. Father would be responsible for 68% ($750 ÷ $1,100) of the primary support need of $415, or $282.20/month, and Mother would be responsible for 32% ($350 ÷ $1,100) of that need, or $132.80/month.

After deducting the primary child support obligation from the available net income, Father has $467.80/month, and Mother has $217.20/month available net income for SOLA support. Of this sum, Father should pay 25%, or $116.95/month; Mother should pay $54.30/month. As Mother is the custodial parent, she retains all her support obligation for the benefit of the two children; and Father pays Mother $399.15/month for child support ($282.20 plus $116.95 SOLA = $399.15/month.

(B) Father and Mother share both joint custody and physical custody of their one child on a 50/50 basis. Father earns $1,500/month; Mother earns $800/month. Neither is remarried; thus, the child is the second person in each household. Each parent's primary support need is $450/month, and the child's primary support need, regardless of which household wherein the child resides, is $180/month.

After deducting their own primary support needs, Father has $1,050/month, and Mother has $350/month available for the support of the child. Thus, Father would be responsible for 75% ($1,050 ÷ $1,400) of the primary support need of $180, or $135/month, and Mother would be responsible for 25% ($350 ÷ $1,400) of that need, or $45.00.

The SOLA support obligation of the parents is 15% of the funds remaining after they meet their own and the child's primary support needs. Thus, the Father owes $137.25 ($1,050 − $135 = $915 × 15%), and Mother owes $45.75 ($350 − $45 = $305.00 × 15%).

According to the above figures, Father's total monthly obligation is $272.25 and Mother's total monthly obligation is $90.75. Because they share custody 50/50 over the course of a year, Father would retain the support he owes for the child during the six months he has custody and pay to Mother support during the other six months. Mother would likewise pay

support to Father during the six months he has custody and retain her support obligation during the six months in which she has custody. Thus, over a year, Father would pay to Mother $272.25 times six months, or $1,633.50; and Mother would pay to Father $90.75 times six months, or $544.50. Accordingly, Father owes $1,089 per year more than Mother owes to Father; thus, Father should pay $90.75/month to Mother to meet this obligation ($1,089 divided by 12 months).

Form 509
(Rev. 12/86)

## APPENDIX II

# The Family Court of the State of Delaware

FOR ____ NEW CASTLE ____ KENT ____ SUSSEX COUNTY

### CHILD SUPPORT CALCULATION

( ____ ) PETITIONER ( ____ ) RESPONDENT

CASE NAME: DATE:

FILE NUMBER:

### PART I. PRIMARY CHILD SUPPORT

STEP A

| | FATHER | MOTHER | TOTAL |
|---|---|---|---|
| Monthly Net Income | $_____ | $_____ | |
| Less Self Support | -_____ | -_____ | |
| Sub-totals | $_____ | $_____ | |

=AVAILABLE NET FOR PRIMARY SUPPORT- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - $_____

STEP B

_____, as _____ person in _____'s household $_____

+_____, as _____ person in _____'s household +_____

+_____, as _____ person in _____'s household +_____

Sub-total $_____

+ MONTHLY CHILD CARE EXPENSES OF WORKING CUSTODIAL PARENT- - - - - - - - - - - - - - - +_____

+ EXTRAORDINARY MEDICAL EXPENSES- - - - - - - - - - - - - - - - - - - - - - - - - - - - +_____

Less EARNINGS OF A DEPENDENT CHILD- - - - - - - - - - - - - - - - - - - - - - - - - - - -_____

= TOTAL PRIMARY CHILD SUPPORT NEED- - - - - - - - - - - - - - - - - - - - - - - - - - - $_____

TOTAL

STEP C

| | FATHER | MOTHER |
|---|---|---|
| Individual Available net | $_____ | $_____ |
| ÷ Total Available Net | ÷_____ | ÷_____ |
| = Share of Primary Support | _____% | _____% |
| x Primary Child Support Need | x_____ | x_____ |
| = PRIMARY SUPPORT OBLIGATION | $_____ | $_____ |

### PART II. STANDARD OF LIVING ADJUSTMENT (SOLA) CHILD SUPPORT

STEP A

| | FATHER | MOTHER |
|---|---|---|
| Available Net for Primary Support | $_____ | $_____ |
| Less Primary Support Obligations | -_____ | -_____ |
| Sub-totals | $_____ | $_____ |

STEP B

| | FATHER | MOTHER |
|---|---|---|
| Available Net for SOLA Support | $_____ | $_____ |
| x Total SOLA Support Percentage | x_____% | x_____% |
| Sub-Total (Products) | $_____ | $_____ |

= SOLA SUPPORT OBLIGATION- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - $_____

STEP C

PER-CHILD SHARE OF SOLA SUPPORT- - - - - - - - - - - - - - - - - - - - - - - - - - - - - $_____

**1218** 

' (CHILD SUPPORT CALCULATION, Continued) Page 2

PART III. TOTAL MONTHLY SUPPORT OBLIGATIONS

| | FATHER | MOTHER |
|---|---|---|
| Primary Support | $_____ | $_____ |
| + SOLA Support | +_____ | +_____ |
| = Total Monthly Child Support Obligation | | |
| Sub-totals | $_____ | $_____ |
| Less Amount Retained by Custodial Parent | -_____ | -_____ |
| = TOTAL MONTHLY ORDERED CHILD SUPPORT | $_____ | $_____ |

PART IV. OPTIONAL SUPPLEMENTAL QUARTERLY CHILD SUPPORT

 The Family Court has the authority to order a parent to pay quarterly child support directly to a child and custodial parent jointly. These payments are designed to relieve the custodial parent of periodic child-related expenses and to make the child aware of support received for his/her benefit from the other parent. Such payments may be awarded by the Court where the amount of monthly child support derived in accordance with the Child Support Calculation is inequitable in light of the relative financial standings of the parties at bar.

 September 1 $_____ December 1 $_____ March 1 $_____ June 1 $_____

 = TOTAL ANNUAL SUPPLEMENTAL CHILD SUPPORT . $_____
 TOTAL

_____

Rule 52(c) and (d)

 ( ) PETITIONER ( ) RESPONDENT

 The Child Support Calculation completed above shall be the party's proposed Order.

 If a party is requesting the Court either to modify the normal formula or to find the formula inequitable in light of 13 Del.C. §505 (b) and/or 13 Del.C. §514, detail below:

(a) Proposed Findings;

(b) Proposed Conclusions;

(c) Proposed Reasons;

(d) Proposed Order;

